United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 28, 2007**

Charles R. Fulbruge III
Clerk

REVISED APRIL 9, 2007

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

No. 06-70013
_____

JOHNNY RAY JOHNSON,

                                   Petitioner - Appellant,

versus

NATHANIEL QUARTERMAN, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS
DIVISION,

                                   Respondent - Appellee.
_____

Appeal from the United States District Court
for the Southern District of Texas, Houston
_____

Before JOLLY, DAVIS, and OWEN, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Johnny Ray Johnson was convicted and sentenced to death for
the 1995 capital murder of Leah Joette Smith. In the post-
conviction proceedings the Texas courts upheld his conviction and
death sentence. In this federal habeas proceeding, the district
court denied relief on the ground that Johnson's petition was not
timely filed under the filing limitation period of the
Antiterrorism and Effective Death Penalty Act ("AEDPA"), and that
he had not demonstrated the rare and exceptional circumstances
necessary for application of the doctrine of equitable tolling.
Alternatively, the district court held that the state court did not

unreasonably deny relief on Johnson's claim that his counsel rendered ineffective assistance. The district court denied Johnson's request for a certificate of appealability ("COA").

Before us, Johnson requests a COA from this court to appeal the district court's denial of relief. With respect to the limitations issue, Johnson argues both equitable and statutory tolling of the deadline. Secondly, Johnson requests a COA for his claim that his counsel rendered ineffective assistance by failing to conduct a complete and thorough mitigation investigation. He contends that readily-available evidence regarding his troubled childhood would have been discovered and that this evidence could have offered some degree of understanding of and explanation for his conduct as an adult. His third ground for a COA is that counsel were ineffective in failing to have a mental health expert conduct a psychological evaluation, and that this failure was unreasonable trial strategy because it was based on insufficient investigation.

We deny Johnson's request for a COA. We conclude that the district court's holding that Johnson's federal habeas petition was untimely under AEDPA is not debatable among jurists of reason. We thus find it unnecessary to address the ineffective assistance claim, and DENY the COA.

Johnson was convicted and sentenced to death for the March 27, 1995 capital murder of Leah Joette Smith during the course of committing or attempting to commit aggravated sexual assault. The State presented evidence, including Johnson's confession, that Johnson offered to give Smith, who was addicted to crack cocaine, some crack cocaine in exchange for sex. After Smith smoked the crack, she refused to have sex with Johnson. He became angry and grabbed her, ripped her clothing off, and threw her to the ground. When she fought back with a wooden board, Johnson repeatedly struck her head against the cement curb. After he hit her head against the cement three or four times, she stopped fighting. He then sexually assaulted her. During the assault, Smith told Johnson that he had better enjoy it because she was going to file rape charges against him. Johnson confessed that he got very angry when Smith hit him with the board and that it was "like something in my head was just saying "'KILL, KILL, KILL.'" After sexually assaulting Smith, Johnson stomped on her face five or six times. He walked away, but realized that he had left his wallet at the scene, so he returned. In his confession, he stated that when he saw Joette's body face up and naked, he sexually assaulted her again and then picked up his wallet and her boots and left Smith there on the ground to die.

Smith sustained numerous severe injuries to her mouth, face, head, and neck: her teeth were knocked out, her tongue was displaced, both sides of her jaw bone were fractured, and she sustained scalp lacerations and a subdural hematoma. The medical examiner testified that she died as a result of swallowing her own blood that had accumulated in the back part of her throat when her jaw bones were fractured. He testified that the subdural hematoma also contributed to her death, but that she could have survived it had she received prompt medical attention. The medical examiner testified that Smith did not die instantly, because it takes a while for the blood to accumulate in the back of the throat.

B.

The jury convicted Johnson for Smith's brutal murder. Then at the punishment phase, the jury heard the State's evidence of Johnson's extensive criminal history, beginning in 1975, including numerous other brutal sexual assaults and murders.

Johnson's niece, Elizabeth Wright, testified that when she was eight or nine years old, Johnson asked her to walk to a store in Houston with him. As they were walking down a trail leading to the back of the store, Johnson knocked Elizabeth down, covered her mouth, pulled her pants to the side, and raped her. He threatened to kill her if she ever told anyone.

In 1983, Johnson was convicted of sexual assault in Travis County and was sentenced to five years in prison. He confessed to raping numerous women in Houston and Austin after his release from

4

prison. When he drove a cab, he stated that he would pick up prostitutes and take them out to the country, rape them, and leave them there, naked.

Theresa Lewis testified that Johnson picked her up in his cab in 1986. She got into the backseat, but Johnson insisted that she sit in the front seat. When he asked her to have sex with him in exchange for $20, she refused and told him she was not a whore. This made him so angry that he pulled over, grabbed her by the neck and began choking her. When she fought back, he struck her in the face with his fist, and then raped her. He was convicted for that crime in 1987, and sentenced to five years in prison.

Johnson then met Dora Ann Moseley, a prostitute, who became his wife. They moved to Austin in 1991 and had some children together. Johnson once beat her so badly that he claims he would have killed her if the police had not been called. She filed a police report a couple of weeks later, after he beat her again. Johnson spent six months in jail for that beating.

Johnson confessed that in the summer of 1994, he met a girl on 11th Street in Austin. They smoked crack and drank, and when she refused to have sex with him, he beat her. He said that she pulled out a razor and cut him on the left side of his neck and that he then bashed her head in and stomped on her. He then claimed that he took her head and gave himself oral sex before having "regular" sex with her. He left her dead body behind a drug store on 11th Street.

5

Johnson confessed that he then raped a woman named Amy on top of a hill across from the Austin police station. He then raped a girl named Eva. When Eva tried to steal his crack cocaine, he grabbed her by the hair, smashed her head into a rock, and then raped her. He said that Eva ran away, yelling and screaming. Shortly before Christmas in 1994, Johnson confessed that he lured a girl into a graveyard in exchange for crack cocaine, and that he raped her three or four times and "slapped her around." He returned to Houston at the end of December 1994.

In February 1995, Johnson sexually assaulted Debra Jenkins, his brother's common-law wife's sister-in-law. She testified that he grabbed her by the throat, threw her onto a bed, and began choking her. He cut the crotch of her pajamas with a pair of scissors, and raped her twice.

On March 27, 1995, a citizen found the badly decomposed body of a female in her thirties, face-down in a water-filled gully near some railroad tracks. The victim had sustained numerous lacerations on her face, as well as severe injuries to her mouth, and there was evidence of manual strangulation. Johnson confessed that he raped and killed this woman, whose identity had not been determined as of the time of Johnson's trial. He said he met her at a crack house and offered her some crack cocaine in exchange for sex. She tried to leave after he refused to give her more crack until she had sex with him, so he grabbed her by the throat and hair and threw her to the ground. She grabbed a rock and hit him

6

on the head and he became angry and banged her head on the railroad track. After she passed out, he sexually assaulted her, then dragged her to the gully and left her there.

The jury also heard his confession that, three days later, he killed another woman. He said that he took her to a warehouse to smoke some crack cocaine. He became angry when she smoked his crack but refused to have sex with him, so he grabbed her by the neck and threw her down on the ground and sexually assaulted her while he choked her. He sexually assaulted her again later, and they smoked some more crack. When she jumped up, he caught her by the hair. When she kept fighting, he banged her head on the pavement until she became unconscious.

The evidence of his brutal rapes and murders seemed endless. On April 28, 1995, the partially clothed body of a female was found underneath a highway overpass in Houston. She had sustained massive head injuries, including a fractured skull and cheekbone, and a large chunk of concrete with blood all over it was found near her head. The autopsy revealed that she died from a crushed head due to blunt trauma and asphyxia due to strangulation. The marking on her throat was consistent with someone placing his foot on her throat and stepping down. Johnson confessed that he killed this woman, who had not been identified as of the time of his trial. They smoked crack cocaine together and he became angry when she refused to have sex with him. She hit him with a wine bottle and he grabbed her and swung her down to the ground. He grabbed her

7

neck and banged her head on a rock.  After she quit fighting, he sexually assaulted her, then hit her head with a rock and left.

Finally, Angela Morris testified that on May 5, 1995, Johnson grabbed her by the neck as she was walking down the street.  He took her down a driveway, struck her, threatened to kill her, and raped her while holding a knife in his hand.  He then tied her up with rags and left.

C.

Prior to trial, Johnson's counsel filed motions for fees to hire a mental health expert and to hire an investigator and mitigation expert.  The trial court granted both motions.  Because Johnson's trial counsel who handled the punishment phase is deceased, the habeas record is incomplete concerning the results of employing these experts.  We do know, however, that the final decision of his attorney at the punishment phase was to call only one witness, Dr. Windel Dickerson, a psychologist.  We also know that Dr. Dickerson was called only to testify that prisoners get less violent as they grow older and that prisoners whose crimes involved drug use were less likely to commit acts of violence in the controlled setting of a prison.  In this connection, the jury was instructed that Johnson, who was 37 years old, would not be eligible for parole until he had served forty years in prison. This limited use of the expert at trial may well have been trial strategy (given Johnson's horrendous record of rape and murder) as other counsel involved in the trial have suggested (see infra, page

8

11), but because of the death of trial counsel, we are left only to speculate.

The record further shows that his attorney introduced Johnson's disciplinary records from his three prior incarcerations in the Texas Department of Criminal Justice, and argued that these records showed his lack of violent behavior while incarcerated and thus indicated that he would not pose a danger to society if sentenced to life imprisonment.

In closing argument, defense counsel urged the jury to consider the fact that, if he were sentenced to life imprisonment, Johnson would have to serve forty years in prison before he would even be eligible for parole, and argued that Johnson's prison disciplinary records, introduced as exhibits by the defense, demonstrated his non-violent behavior while incarcerated. Counsel also pointed to Dr. Dickerson's testimony that people are less likely to commit crimes as they get older and that they are less likely to commit crimes of violence in the structured and controlled setting of a prison, especially given that there would be no alcohol, crack cocaine, or prostitutes available to Johnson in prison.

The jury returned a punishment verdict after deliberating for only one hour and fifteen minutes. It answered the special issue on future dangerousness "yes" and answered the special issue on mitigation "no".

Johnson's conviction and sentence were affirmed on direct appeal. Johnson v. State, No. 72,422 (Tex. Crim. App. 1998).

II.

A.

Johnson filed a petition for state habeas relief on July 17, 1998. He alleged that his trial counsel rendered ineffective assistance (1) at the guilt-innocence phase, when they failed to have him psychologically evaluated for the purpose of advancing an insanity defense; (2) at the punishment phase when they failed to have him psychologically evaluated for use as mitigation evidence, when records from the Texas Department of Criminal Justice indicated that he had a history of major emotional disorder which included both auditory and visual hallucinations; and (3) at the punishment phase, when they failed to investigate adequately his history, when such historical information was essential in the preparation of a biopsychosocial assessment by an expert in the area of mitigation, thereby denying him the opportunity to present mitigating evidence. Johnson's discussion of these claims consists of three pages in his state habeas application, and he did not present any affidavits or other evidence in support of them.

Johnson was represented by attorneys Guerinot and Millin at trial. Guerinot handled the guilt-innocence phase, and Millin was responsible for the punishment phase. As we have earlier indicated, Millin had died prior to the commencement of the state habeas proceedings and his files could not be located. The state

habeas court ordered Guerinot to submit an affidavit responding to Johnson's ineffective assistance claims. In his affidavit, Guerinot stated that Johnson never exhibited any signs of insanity and always appeared to be lucid, competent, and sane; and that he believed that Johnson was examined by a mental health expert, and that Millin decided not to use the information resulting from the examination because it was "severely detrimental" to Johnson's case. Regarding the claim of failure to investigate Johnson's personal history, Guerinot stated that in the light of the evidence that Johnson had terrorized and raped members of his own family, it was unlikely that evidence in that area would have been favorable to the defense.

One of the prosecutors at trial, Bill Hawkins, also submitted an affidavit in the state habeas proceeding. He stated that Millin told him that he could not afford to put on any witnesses in the mental health area because such testimony would hurt a lot more than it helped.

The state habeas court found that a psychological interview of Johnson was conducted on December 23, 1983 (more than ten years before the murder of Smith), when Johnson was an inmate in the Texas Department of Criminal Justice. In the interview, he stated that he had visions of his mother and heard her telling him what to do. He stated that he twice tried to kill himself, once in the county jail, and once by jumping off a cliff. A month after that interview, psychologist Wilson Lilly stated in clinic notes:

11

"Inmate Johnson was called in on recommendation of the mental health screening process. He has a history of major emotional disorder which included both auditory and visual hallucinations. Currently, he denies such symptoms. His mental status is clear and appropriate except for a mild depression of mood. He does not desire mental health services at this time, but was advised to seek [treatment] should any of his past symptoms return." The state habeas court found that there was no mention of any mental health problems during the records of Johnson's later incarcerations, and that health questionnaires completed in July and October 1992 stated that there were no signs of a mental disorder.

The state habeas court concluded that trial counsel were not ineffective in failing to investigate or present an insanity defense, and that Johnson was not prejudiced thereby. It made the following conclusions with respect to his claims of ineffective assistance for failure to investigate his history and failure to have him psychologically evaluated for purposes of mitigation:

> Because trial counsel believed that the evidence concerning [Johnson]'s personal history would not have been favorable to [Johnson]'s defense, trial counsel were not ineffective in failing to present evidence of [Johnson]'s history for the purposes of mitigation....
>
> Because the evidence showed that [Johnson] had terrorized and raped members of his own family, it was reasonable for trial counsel to limit [their] investigation of [Johnson]'s history for the purposes of mitigation....

12

Because trial counsel believed that testimony of psychological witnesses would have hurt [Johnson]'s case more than it helped, it was reasonable for trial counsel to cho[o]se not to put such witnesses on the stand for the purposes of mitigation....

Because [Johnson] had raped and terrorized members of his own family, [Johnson] has failed to show that he was prejudiced by any deficient performance on the part of his trial counsel in failing to put forth evidence of [Johnson]'s history for the purposes of mitigation.

Because trial counsel believed that testimony of psychological witnesses would have hurt [Johnson]'s case more than it helped, [Johnson] has failed to show that he was prejudiced by any deficient performance on the part of his trial counsel in failing to put forth the testimony of any additional mental health experts for the purposes of answering the mitigation or future danger special issues....

The Texas Court of Criminal Appeals adopted the state habeas court's findings of fact and conclusions of law and denied his application for state habeas relief on February 18, 2004. Ex parte Johnson, No. 57,854-01 (Tex. Crim. App. 2004). We now turn to the federal habeas proceedings.

B.

Johnson's federal habeas petition was stamped "filed" on January 3, 2005. The district court held that the petition was untimely filed and that Johnson was not entitled to the benefit of equitable tolling. The district court denied relief on the alternative ground that the state court did not unreasonably deny

13

relief on Johnson's ineffective assistance claim. The district court denied Johnson's request for a COA.

## III.

## A.

Johnson now requests a COA from this court to appeal the district court's ruling that his petition was untimely filed and its alternative ruling that he is not entitled to relief on his ineffective assistance of counsel claim.

To obtain a COA, Johnson must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(1)(A). With respect to the district court's procedural ruling that Johnson's habeas petition was not timely filed, Johnson must show, "at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000). To make a substantial showing of the denial of a constitutional right with respect to the district court's alternative holding that the state court did not unreasonably deny relief on Johnson's ineffective assistance of counsel claim, Johnson must demonstrate "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

14

In making our decision whether to grant a COA, we conduct a "threshold inquiry", which consists of "an overview of the claims in the habeas petition and a general assessment of their merits." Id. at 327, 336. "While the nature of a capital case is not of itself sufficient to warrant the issuance of a COA, in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor." Ramirez v. Dretke, 398 F.3d 691, 694 (5th Cir. 2005) (internal quotations, citations, and brackets omitted).

We address Johnson's equitable tolling claim first, and then turn to his statutory tolling claim, which was not presented to the district court. Because we conclude that Johnson has not made a substantial showing that the district court erred in its procedural ruling, it is not necessary for us to address Johnson's request for a COA on the ineffective assistance claim.

B.

AEDPA establishes a one-year statute of limitations for seeking federal habeas corpus relief from a state-court judgment. 28 U.S.C. § 2244(d)(1). That period begins to run from "the date on which the [state court] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). The one-year period is tolled, however, during the pendency of a state prisoner's post-conviction proceedings in state court. 28 U.S.C. § 2244(d)(2).

15

Johnson's judgment of conviction became final on May 26, 1998. Therefore, the limitations period began to run on May 27, 1998. The limitations period was tolled, however, from July 17, 1998, when Johnson filed his state habeas petition, until February 18, 2004, when the Texas Court of Criminal Appeals denied state habeas relief. Therefore, Johnson had 313 days remaining after his state writ was denied, or until December 27, 2004, to file his federal habeas petition.

Johnson does not dispute that the deadline for filing his federal habeas petition was Monday, December 27, 2004. In the district court, Johnson contended that, while putting finishing touches on the petition at approximately 7:30 p.m. on the due date, his counsel's computer failed. Johnson also claimed that the State agreed to extend the deadline for filing the petition until "at least" Thursday, December 30. Johnson maintained that this date was "just an estimate," and that his counsel "assumed ... that the agreed upon extension period was somewhat flexible." Counsel for the State denied agreeing to any extension of any length. Johnson asserts that the petition was filed on Friday, December 31, although it was not stamped "filed" by the district court clerk's office until January 3, because there was a problem with the time-stamp at the court's after-hours drop box. Johnson argued to the district court that he is entitled to equitable tolling of the statute of limitations because of the computer failure and the State's alleged agreement to extend the deadline.

16

The district court stated that the most generous reading of Johnson's claim of equitable tolling is that the State agreed to an extension of time until December 30, but by Johnson's own admission, he did not attempt to file the petition until December 31. Although he justified the late filing by asserting that he "assumed" the deadline was flexible, he pointed to no statement by the State supporting that assumption and thus could not claim that the State in any way misled him. The district court held that Johnson's explanation for his late filing, at most, rises only to the level of excusable neglect, that does not support equitable tolling. The court noted that Johnson offered no reason why he could not have filed a skeletal petition (handwritten, if necessary) either by the statutory deadline or by the allegedly extended deadline. The court stated that Johnson could have supplemented the skeletal petition after the computer was repaired. Therefore, the court concluded that Johnson had failed to demonstrate the rare and exceptional circumstances required for application of equitable tolling.

The State points out that Johnson's counsel were appointed on March 12, 2004, and thus had nine months in which to prepare the petition before the deadline of December 27, 2004. The State observes that the computer failure occurred at 7:30 p.m. on the very day the petition was due to be filed, and thus counsel waited until the last minute to complete the petition, demonstrating a

17

lack of diligence which cannot support application of the doctrine of equitable tolling.

The Supreme Court has not decided whether the AEDPA limitations period may be equitably tolled. In Lawrence v. Florida, 127 S.Ct. 1079 (2007), however, the Supreme Court, when assuming without deciding that equitable tolling is available, was specific: To be entitled to equitable tolling, the petitioner "must show (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Id. at 1085 (internal quotations and citation omitted). In accord with the Lawrence standard, our court has held that equitable tolling of the AEDPA limitations period is available "'in rare and exceptional circumstances' where it is necessary to 'preserve[] a plaintiff's claims when strict application of the statute of limitations would be inequitable.'" Fierro v. Cockrell, 294 F.3d 674, 682 (5th Cir. 2002) (quoting Davis v. Johnson, 158 F.3d 806, 810-11 (5th Cir. 1998)). We have applied equitable tolling where the district court has done something to mislead the petitioner into believing that his petition is due after the limitations period has expired. Compare Prieto v. Quarterman, 456 F.3d 511, 514-15 (5th Cir. 2006) (equitable tolling applied where petitioner requested and received extension of time from district court before deadline to file habeas petition and relied in good faith on that extension) and United States v. Patterson, 211 F.3d 927, 931-32 (5th Cir. 2000) (applying equitable tolling where district court granted pro se

18

prisoner's request to dismiss petition without prejudice so that prisoner could retain counsel and refile petition later), with Fierro v. Cockrell, 294 F.3d at 682-84 (refusing to apply equitable tolling where district court issued scheduling order at government's request setting deadline for habeas petition outside limitations period, because the scheduling order was requested and issued after the limitations period had expired and thus neither the request nor the order could have contributed to Fierro's failure to file within the limitations period).

"[N]either 'excusable neglect' nor ignorance of the law is sufficient to justify equitable tolling." Id. at 682. The court in Fierro "recognize[d] that the application of procedural rules may appear formalistic -- particularly in a death penalty case -- when applied to bar a facially plausible habeas petition because of an error by habeas counsel." Id. at 684. However, the court also noted "that Congress has imposed a strict one-year limitations period for the filing of all habeas petitions under the AEDPA, subject only to the narrowest of exceptions." Id. The court concluded that the circumstances of Fierro's case -- his counsel's mistaken assumption that the statute of limitations did not apply to successive habeas petitions and the scheduling order setting the deadline for filing the petition beyond the limitations period -- were not "the sort of rare and exceptional circumstances that would justify equitable tolling." Id.

19

In _Lawrence_, also a death penalty case, the petitioner argued, _inter alia_, "that his counsel's mistake in miscalculating the limitations period entitle[d] him to equitable tolling." 107 S.Ct. at 1085. The Supreme Court rejected that contention, noting that, "[i]f credited, this argument would essentially equitably toll limitations periods for every person whose attorney missed a deadline." _Id_. The Court stated that "[a]ttorney miscalculation is simply not sufficient to warrant equitable tolling, particularly in the postconviction context where prisoners have no constitutional right to counsel." _Id_.

The circumstances of Johnson's case are more like the circumstances in _Fierro_ and _Lawrence_ than those in _Prieto_ and _Patterson_. His counsel was well aware of the deadline and had ample time to prepare the petition, but waited until the very last minute to complete it. Even when counsel's computer failed on the evening of the due date, counsel could have filed a skeletal handwritten petition and supplemented it later. Even accepting Johnson's counsel's assertion that the State's counsel agreed to extend the deadline until December 30 (which the State denies) Johnson's counsel must have known that an attorney for the State has no authority to extend the statutory deadline established by Congress. In any event, counsel still did not file the petition until December 31, relying on a completely unsupported "assumption" that the extension allegedly agreed to by the State was "flexible".

20

We are not persuaded that reasonable jurists would find debatable the district court's decision that Johnson is not entitled to equitable tolling of the statute of limitations based on the circumstances present in this case. Counsel was aware of the deadline, and had months in which to complete the petition, but waited until the very last minute on the due date to complete work on it when the computer failed. Notwithstanding the computer failure, counsel offers no explanation as to why a handwritten skeletal petition could not have been filed on the due date, to be supplemented later. The State denies agreeing to any extension -- and indeed, it had no authority to extend the statutory deadline. Johnson's counsel must have known that they could not rely on such an unauthorized extension and obviously cannot now argue that they were "misled" into believing that the statutory deadline had been extended. Even assuming such an agreement with the State's attorney existed, there is no documentation for it, and certainly nothing to substantiate counsel's assumption that the deadline was "flexible". Finally, counsel still did not file the petition on the allegedly agreed-upon deadline; instead, they say that they attempted to file it after hours the next day, even though it was officially stamped on January 3, some seven days after it was due. These circumstances are not "rare and extraordinary" and cannot justify equitable tolling under our precedent. Moreover, Johnson cannot possibly satisfy the Supreme Court standard set out in Lawrence, which makes clear that even if equitable tolling of

21

AEDPA's statute of limitations might be available, the petitioner must pursue his rights diligently (here Johnson had nine months to file his petition and waited until the last minute) and second, some extraordinary circumstance must have stood in his way of a timely filing (here, nothing stood in his way of a timely skeletal filing).

C.

Johnson contends, for the first time in his COA application filed in this court, that his petition was timely filed because the 90-day period for filing a petition for a writ of certiorari from the Texas Court of Criminal Appeals' denial of state habeas relief should be included in the time during which his state habeas application was "pending". Because Johnson did not raise this statutory tolling argument in the district court, or request a COA from the district court for this claim, this court has no authority to grant a COA for the claim. See Goodwin v. Johnson, 224 F.3d 450, 459 & n.6 (5th Cir. 2000).

Furthermore, this contention is foreclosed by Supreme Court and Fifth Circuit precedent. See Lawrence v. Florida, 127 S.Ct. at 1083 (holding that the one-year limitations period is not tolled during the pendency of a petition for certiorari from denial of state habeas relief); Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999) (limitations period is not tolled "from the time of denial of state habeas relief by the state high court until the time in which

22

a petitioner could have petitioned the United States Supreme Court for certiorari").

### D.

Because we conclude that the district court's procedural ruling is not debatable, it is not necessary for us to address whether reasonable jurists would find debatable the district court's alternative ruling that the state courts did not unreasonably apply clearly established federal law in denying relief on Johnson's ineffective assistance claim.[*]

---

[*]We do note, however, that Johnson did not present to the state courts any mitigating evidence that allegedly could have been discovered in an adequate investigation. Johnson explains that because his claim is a "categorical" one, it is not dependent on proof that particular testimony or evidence was available. But see Miller v. Dretke, 420 F.3d 356, 361 (5th Cir. 2005) ("To establish that an attorney was ineffective for failure to investigate, a petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial."). In federal court, he submitted an affidavit of a mitigation specialist who stated that she had spoken with friends and family members who would have been willing to testify had they been asked, and that she had discovered evidence concerning Johnson's extensive emotional, physical, and sexual abuse suffered in a number of state-sponsored foster homes; limited success in school due to a low IQ, behavioral problems and learning disabilities; difficulty adjusting to inner-city life in Austin after having lived in a smaller community; an "untreated/undiagnosed mental illness" that affected his ability to function normally at home and at work; and an extensive family history of, and genetic predisposition to, substance abuse. None of the individuals referred to in the mitigation specialist's affidavit presented affidavits in either the state or federal habeas proceedings. See Dowthitt v. Johnson, 230 F.3d 733, 746 (5th Cir. 2000) (a claim is not exhausted when the petitioner offers in federal court material additional factual allegations and evidentiary support that were not presented in state court).

The district court held that, even if considered, the mitigation specialist's affidavit would provide no grounds for

IV.

For the foregoing reasons, Johnson's application for a COA is

DENIED.

---

relief because, in the context of Johnson's extensive history of extreme and brutal violence, it is highly unlikely that evidence of Johnson's childhood abuse and privations in foster homes was so compelling that there is a reasonable probability that at least one juror could have reasonably determined that death was not an appropriate sentence.  As we have indicated, we do not address this holding of the district court.

24